IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 24 CR 72-1-RBW |
| v. ) | |
| ) | Hon. Judge Reggie B. Walton |
| KELLY FONTAINE ) | |

### DEFENDANT FONTAINE'S SENTENCING MEMORANDUM

Defendant KELLY FONTAINE, by the Federal Defender Program for the Northern District of Illinois and its attorney, DANIEL HESLER, respectfully submits the following memorandum concerning sentencing as follows:[1]

### I.   The offense conduct

This is a January 6 case. Ms. Fontaine, along with her then boyfriend (and now husband) Bryan Dula, travelled to Washington D.C. on January 5, 2021. They were not part of any organized group. As outlined in the Statement of Offense, they attended part of the rally at the National Mall, then slowly made their way towards the Capitol Building. They were nowhere near the front of the crowd that was moving that direction. At approximately 2:55 p.m., after others breached a

---

[1] Kelly Fontaine and her codefendant, Bryan Dula started dating in 2019. They were married in 2022. It is difficult to analytically separate the two because they travelled together on January 6, for similar reasons, remained together every moment that day, have similar backgrounds, and have experienced post-offense life similarly. This memo is for Ms. Fontaine, with Mr. Dula submitting a separate memo through his counsel. Nevertheless, there is not much distinction between their situations. If there is any, it is that Kelly initially suggested the trip. That is one more thing that she feels guilty about.

1

door, they walked into the Capitol Building. Once inside, after taking a few pictures, they began to feel uneasy about some of the things they saw. They left the building at 3:06 p.m.

## II.     The sentencing options and §3553 factors

Because the two offenses of conviction are Class B misdemeanors, the sentencing guidelines do not apply. The statutory range (including both counts) is up to one year of custody, or up to five years' probation. The primary question is what sentence would be sufficient, but not greater than necessary, to satisfy the purposes of sentencing listed in 18 U.S.C. §3553?

### A.     Mitigation involving the offense conduct

This discussion necessarily starts with an acknowledgment. Kelly Fontaine (and Bryan Dula) may be on the less-active end of the spectrum of participation in the unrest that occurred on January 6, but the conduct that they were a part of was a grave threat to the survival of our democracy. Tens of thousands of people came to Washington, and thousands of those walked to the Capitol just at the time scheduled for the certification of the 2020 election. The front of the crowd overwhelmed the Capitol police, some people chanted to hang the Vice President for doing his duty, and rioters eventually broke into the Capitol. Both houses of Congress had to stop what they were doing and shelter in fear for their lives. The proceedings to certify the results of a legitimate election were delayed, and came

close to not occurring. Several people died that day or soon thereafter, and hundreds of police officers were injured. Kelly Fontaine and Bryan Dula played a culpable part in that historic event, and no attempt is being made to minimize the significance of that.

With all that conceded, Kelly and Bryan did not do that much, comparatively. They went to the rally and then walked to the Capitol, providing a sense of "we" to the more aggressive people in front of them. Their timing and position in the crowd was such that they did not actually see the violent clashes between rioters and the police. By the time they reached the Capitol, the barricades were overturned and the police had generally retreated into the building. Kelly and Bryan saw people trying to get into the Capitol. After someone opened a door, they followed the crowd into the building. They took a few pictures. After 11 minutes, they left. They personally damaged nothing, and fought no one.

None of this makes them not guilty of the offenses they have pled guilty to. What they did was both illegal and wrong. But, within the scope of the events of January 6, 2021, their conduct was not the worst.

**B.     Mitigation from before January 6, 2021, including the reasons why they participated in these offenses.**

Kelly Fontaine grew up in a blue collar community outside of Chicago. Her father was a railroad machinist, and her mother worked as a receptionist in a veterinary office. She completed high school in 1987. She had two daughters, but

3

essentially remained a single mother until her marriage to Mr. Dula in 2022. One of her daughters is a teenager; the other is a young adult, but presently living at home again. Ongoing difficulties with the father of one of her daughters have been a source of stress. Another stressor has been her responsibilities to her aging parents. Her father has Alzheimer's disease. She sees him multiple times each week, attends his medical appointments, and generally helps her mother. Additionally, Kelly has been engaged in her community and in the lives of her children. For example, she was a girl scout leader for 8 years, and has been active in her church, as well as volunteering for her children's schools and sports. Ms. Fontaine has worked all of her life. Since 2017, she has been a manager at a towing company. She has no significant criminal history, and has had no problems on bond.[2]

In 2019, Ms. Fontaine met Bryan Dula. They were married in 2022. This trip to Washington occurred while they were dating. The reason they went is not unique to Kelly and Bryan. At the time, Ms. Fontaine would have said she went to express her view that an election should not be certified while doubts about its legitimacy still lingered, and she hoped to hear a recount announced that would help reunify the country. That was Kelly's subjective thinking at the time.

---

[2] Some letters concerning Ms. Fontaine may be submitted in the next day or two in a separate filing. Counsel is still waiting on one letter.

Viewed objectively, the simplest explanation of why Kelly and Bryan went to Washington that day is because Donald Trump invited them. Mr. On December 19, 2020, Trump tweeted "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild." He and others working in concert with him did everything in their power to make people believe that the election had been stolen and that helping Donald Trump helped America. He strategically appealed to the same kinds of impulses in Kelly and Bryan that in previous generations inspired hundreds of thousands of Americans to enlist to fight and die in World War II.

There is, at very least, probable cause to believe that the gathering of Trump supporters and their attack on the Capitol on January 6 was one prong of a larger scheme to keep Donald Trump in power despite losing the 2020 election.[3] To remain president, Trump needed the help of tens of thousands of people. He needed communications and media people to help create and spread the false narrative that the election had somehow been fraudulent. He needed insiders in government and Congress to create a pretense of propriety, and lawyers to create a

---

[3] *See generally*, *United States v. Trump*, 23 CR 257, ECF #1 (an indictment alleging that Donald Trump conspired and attempted to unlawfully remain in power despite losing an election, including by encouraging his supporters to come to Washington on January 6, walk to the Capitol, and "fight like hell."). The fact that such an indictment was returned indicates that a grand jury found probable cause to believe that the allegations made in it are true.

colorable rationale for his plans. He needed tough guys like the Proud Boys and Oath Keepers to be front line soldiers. And he needed ordinary people like Kelly and Bryan to be there to make the whole thing seem more normal, as if all of this was a grass-roots reaction to actual election irregularities. Some of the participants may have understood exactly what they were doing. Others, like Kelly and Bryan, were persuaded to assist through disinformation and appeals to patriotism.[4]

    None of this excuses Kelly or Bryan's conduct on January 6 itself. Despite everything, they should have known better. It is a basic principle of civilized society that if doors are locked, you do not have permission to break them down or enter through windows. Following others who have done so is only marginally less culpable. Ordinary people understand that although government buildings are funded by our taxes, that does not mean the public has uncontrolled access to the Capitol any more than any of us have the right to break into a post office at 3:00 a.m. Furthermore, the rights to protest and free expression do not create a right to intimidate or interfere with government employees who are doing their jobs. But a

---

[4] Any discussion of persuasion via disinformation risks being interpreted as an argument that the defendants are not responsible for what they did. Kelly and Bryan are <u>not</u> taking that position; they acknowledge that they had options, they made poor choices, and should have known better. Especially with the benefit of hindsight, they take full responsibility for their actions. Nevertheless, this discussion is not entirely inapt. There was a concerted effort by Trump and his allies to persuade ordinarily law-abiding people that coming to Washington and demonstrating in order to prevent the peaceful transition of power was a reasonable and patriotic thing to do.

closed news bubble, a sense of just being part of a crowd, and the intentional actions of people who wanted good people like Kelly and Bryan there to provide cover for their coup attempt, repeatedly reinforced the morality of these actions. Although none of this excuses their conduct, this context makes Kelly and Bryan's actions <u>slightly</u> more understandable.

    **C.**    **Mitigation since January 6, 2021.**

If that was the only argument to be made, the §3553 interests might still make a custodial sentence appropriate. If Ms. Fontaine and Mr. Dula were likely to do this kind of thing again, incapacitation might be needed. If they suffered no other consequences, this Court would have reasons to create some. If they did not appreciate the gravity of what they did and were a part of, the Court could take that into account. None of those rationales apply here. The §3553 interests in punishment, deterrence, rehabilitation and incapacitation do not require incarceration in light of Kelly and Bryan's response to their own wrongdoing because they have appropriately learned from their mistakes.

Kelly and Bryan cheerfully entered the Capitol Building around 2:55 p.m. on January 6. The story of their remorse and regret begins by 2:57 p.m. Shortly after they had filed into the Capitol Building and taken a few photos, Kelly and Bryan saw people carrying flags that Kelly thought of as "fancy." They were not the kind of flags that people waved at rallies; they looked like they originated from within

the Capitol itself. Despite the fact that they had just walked by overturned barricades and seen people trying to break into the Capitol, Kelly and Bryan were bothered by the realization that people were stealing things from within the Capitol Building. They had come to make their voices heard, and nothing more. They also saw police dragging out some woman who was kicking and screaming. Because of issues of timing and location, that was the first person-to-person physical conflict they had witnessed that day. They decided they wanted out. Because of the continuing inward flow of the crowd, they could not leave the way they came in, so they asked an officer how to get out. It took a few minutes of navigation, but they exited the building.

Eventually, they made it back to their hotel. By then, they had heard that a woman had been shot, but didn't know the details. They turned on the TV in their hotel room and saw footage of the violent confrontations between police and the front-line rioters. Immediately, their budding unease increased dramatically. By nightfall on January 6, Kelly reports feeling a profound sense of guilt at having been present in a mob that desecrated the Capitol, stole property, and violently assaulted police officers. That shame remains with her to this day.

Kelly and Bryan see their actions very differently now than they did at 2:55 p.m. on January 6. Their overwhelming feeling about what they did is regret. They regret that they went. They regret that they wanted to go. They regret that they did

not think for themselves. Previously they had seen themselves as people who did not break the law. That belief has been shaken, because they did break the law. Kelly feels pangs of regret every time she talks to her daughters, because she recognizes that she, not so long ago, did exactly what she tells them not to do. She had gone with the crowd and the moment, instead of listening to her own better judgment. Kelly and Bryan are committed to not making that mistake again, or anything remotely like it.

Their actions on that day in 2021 continued and still continue to affect their lives. For 18 months after January of 2021, they lived in dread of a visit from the FBI. Eventually, in September of 2022, that day arrived. They fully admitted to their actions. That did not alleviate their stress; it merely moved them to the next stage, of waiting for charges to be brought.

Moreover, Kelly (and Bryan) live in a state and area where being a January 6 defendant is not treated as a badge of honor. After charges were finally brought in February of 2024, the local papers and TV news publicized their arrests.[5] Shortly thereafter, Ms. Fontaine received a phone call from her daughter's school. Other

---

[5] *E.g.,* Caroline Kubzansky, *Lockport couple latest Illinois residents to be charged in Jan. 6 Capitol riot*, Chicago Tribune (Feb. 3, 2024), https://www.chicagotribune.com/2024/02/02/lockport-couple-latest-illinois-residents-to-be-charged-in-jan-6-capitol-riots/; Jon Seidel, *Southwest suburban residents charged with entering U.S. Capitol on Jan. 6*, Chicago Sun-Times (Feb. 2, 2024), https://chicago.suntimes.com/crime/2024/2/1/24058725/us-capitol-jan6-trump-insurrection-attack-electoral-college-vote-count-washington-security-probe-fbi.

students had heard the news and were harassing her daughter, and Ms. Fontaine needed to come in to talk about a plan to address any bullying issues. It was a traumatic day for the entire family. Similar publicity repeated itself with the guilty pleas, and may do so again with the sentencings. It pains Ms. Fontaine that her daughters have been stigmatized because of her actions. In Kelly's words, "It kills me. Hurting my children is the worst part of all of it."

Moreover, Ms. Fontaine's realization that what she did was wrong makes her pain at what her children have gone through even worse. It would be one thing to say "honey, you are paying the price because I am a patriot who stood up for my beliefs." It feels even worse to say to one's children "honey, you are paying the price because I was an idiot." There is no silver lining in that. But that is a part of what Kelly and Bryan have experienced and are still experiencing. The point is this; this Court does not need to inflict more discomfort on these defendants in order for this conduct to have had painful consequences they will never forget.

### III.    Restitution should be ordered as agreed in the plea agreement.

An argument could be made that restitution might not be appropriate for people like Kelly and Bryan, who did not personally damage any property, and were not consciously working in concert with anyone who did. That argument is <u>not</u> being made here. The Capitol Building was damaged that day, and the cost of cleaning and repairs is only a small part of the harm of January 6. Moreover, the

defendants here have agreed in their plea agreement that each of them should pay restitution in the amount of $500. Kelly (and Bryan) accept that completely.

To the extent that these defendants are paying $500 each despite not physically damaging anything themselves, it is hoped that the Court might consider that as part of their punishment, along with the heartache, shame, and regret they have suffered over the last three years. Viewed another way, the instincts towards "doing their part" that misguidedly sent Kelly and Bryan to Washington in 2021 operate differently now. Kelly Fontaine and Bryan Dula now consider paying $500 each as one component of doing their part to make amends.

### IV.  Conditions of Probation (or Supervised Release)

With regard to the conditions of either probation or supervised release, Ms. Fontaine has no objections to the conditions proposed in the PSR. Those conditions seem appropriate for the nature of the offense and the characteristics of the defendant. If the Court orders community service, she will comply. It is debatable whether community service is necessary under §3553 in this case. The same can be said for any period of home incarceration or home detention. Also, that kind of condition of probation may be of limited value here. Kelly's primary recreational activities involve her family, church, and community. It is not clear that restricting those kinds of activities would have a net positive effect, either on the defendant or

on the society around them. But Ms. Fontaine will comply with any conditions ordered.

## Conclusion

Kelly Fontaine is truly remorseful for her actions on January 6. As a parent, she has tried to model good decision-making for her children. She now recognizes that her actions in January of 2021 were the exact opposite of that. She (and Bryan) are resolved to do better. No matter what, Ms. Fontaine accepts responsibility for her actions. She recognizes that what they did was wrong, and there is zero chance she will do anything like that again. It is hoped the Court will not deem any period of incarceration necessary in this case.

For all these reasons, for defendant Kelly Fontaine, it is hoped that a sentence of probation with appropriate conditions, along with $500 in restitution and $20 in special assessments, would be sufficient but not greater than necessary in this case.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy
Executive Director

By: *s/ Daniel J. Hesler*
    Daniel J. Hesler

DANIEL J. HESLER
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, IL 60603
(312) 621-8347